

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00205-CV

_____

IN THE INTEREST OF E.B., A CHILD

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. DC89-CP2021-0066

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellant T.C. (Mother) appeals the trial court's order terminating her parental rights to her child, E.B. In three issues, Mother argues that the evidence is legally and factually insufficient to support the termination of her parental rights under Texas Family Code Subsections 161.001(b)(1)(N) and (O) and that the evidence is legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights is in E.B.'s best interest. We will affirm the trial court's order terminating Mother's parental rights to E.B.

## I. Background

On December 29, 2020—two days after E.B. was born—the Texas Department of Family and Protective Services (TDFPS) received a report that Mother had given birth to a child and had reported using marijuana and methamphetamine during the pregnancy. TDFPS opened an investigation and ultimately filed a petition seeking removal of E.B. from Mother's care and termination of Mother's parental rights. E.B. was removed on January 11, 2021. K.B., who was later adjudicated as the father of E.B., was found deceased in his home the same day.

After a bench trial before an associate judge, Mother's parental rights were terminated based on findings that Mother had constructively abandoned E.B., that Mother had failed to comply with her service plan, and that termination of Mother's parental rights is in E.B.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N),

2

(O), (b)(2).[1] Mother then requested a de novo hearing, and the findings of the associate judge were approved and adopted.[2] This appeal followed.

## A. TDFPS's Investigation

During its investigation, TDFPS developed concerns related to Mother's illegal drug use, Mother's mental health, Mother's criminal history and imminent incarceration, K.B.'s passivity toward Mother's behavior, and Mother's overall inability to care for E.B.

### 1. Mother's Drug Use

Despite admitting to using illegal drugs while she was pregnant with E.B., Mother refused to submit to a drug test after delivering E.B. at the hospital. TDFPS later met with Mother at the hospital where E.B. was born, and Mother eventually agreed to submit to a drug test the following day, on December 30, 2020. Mother did not show up for her drug test that day.

Approximately one week after E.B. was born, Mother admitted to TDFPS that she did not submit to a drug test when E.B. was born because she knew the test results would be positive for methamphetamines. Mother then divulged that she had used methamphetamines just two days earlier—sometime around January 4, 2021.

---

[1] TDFPS abandoned all grounds for termination raised in its petition except for Subsections 161.001(b)(1)(N) and (O).

[2] Mother did not "wish to testify" at the de novo hearing and rested without presenting any evidence.

3

The very next day, Mother admitted that she had used methamphetamines the night before.

Around the same time, Mother called TDFPS and asked why she had not been informed that E.B. had died. But E.B. was fine. Mother exhibited "erratic" behavior, and according to a TDFPS investigator, Mother was not making any sense. Mother's probation officer later reported that, although Mother was supposed to check in with him weekly, he had not seen her in approximately three months. He also relayed that Mother's drug-test results from September 2020 were negative but that she had not submitted to drug testing since then.

When E.B. was approximately one week old, K.B. reported concerns to the TDFPS investigator that Mother was using methamphetamines and that he did not want to communicate with her while she was "like that." During TDFPS's investigation, K.B. and his mother agreed to care for E.B. and to keep Mother away from E.B. E.B. remained in K.B.'s possession until January 11, 2021, when K.B. was found deceased in his home and E.B. was removed by TDFPS. Local law enforcement made TDFPS aware of K.B.'s death, and a TDFPS investigator immediately responded to the residence. Despite K.B.'s assurance that he would not allow any contact between Mother and E.B., there was evidence that Mother had also been staying at the residence with E.B. When the TDFPS investigator arrived at the home, Mother was present and appeared to be under the influence of illegal drugs. Specifically, she could not spell her name, she repeatedly crawled back into bed while

being questioned by law enforcement, and she was "very erratic." Mother admitted to using marijuana with K.B. the night before but did not respond when questioned about methamphetamine use. Further, Mother was unable to provide TDFPS with any appropriate caregivers for E.B. at that time.

## 2. Mother's Criminal History

When TDFPS first met with Mother at the hospital where E.B. was born, Mother told TDFPS that she had a history of domestic violence with her ex-boyfriend and that she had been arrested "a few times" for assault. Mother then admitted that she violated probation when she was arrested for possession of marijuana and had been ordered to go to an Intermediate Sanction Facility (ISF) for ninety days, beginning January 25, 2021.

TDFPS also discovered that Mother's criminal history consisted of several charges and convictions for assault- and drug-related offenses, including bodily-injury assaults, family-member assaults, aggravated assault, aggravated assault with a deadly weapon, and possession of marijuana.

## B. Mother's Service Plan

With the goal of family reunification, a family plan of service was prepared for Mother on February 8, 2021, with a target completion date of February 7, 2022. Mother did not participate in her service plan meeting but was later provided a copy of the service plan to review with her case worker during an in-person meeting. Mother also signed receipt of her service plan while she was incarcerated on

March 11, 2021, which was filed with the trial court. Mother's required services included parenting classes, individual counseling, a psychological evaluation, and the completion of a drug assessment. She was also ordered to complete substance abuse counseling, to attend NA/AA meetings, to participate in random drug screens, to attend weekly visitations with E.B. once she was no longer incarcerated, and to provide proof of income and proof of a safe and stable home environment. Mother did not complete any of these services. At the time of trial, Mother had not started any services.

Mother was incarcerated from approximately January 2021 until November 2021. During that time, Mother returned one parenting packet in September 2021 and maintained contact with her initial case worker via mail. She also reported to TDFPS that she had attended "daily group and therapy classes" while incarcerated. At trial, 2INgage case manager Stephanie Pickrell[3] testified on behalf of TDFPS. Pickrell acknowledged that when a parent is incarcerated, it is more difficult for that parent to complete their services. Specifically, the parent's ability to complete psychological services, to attend individual counseling or substance abuse counseling, to complete a drug assessment, to obtain stable income or housing, and to have visitations with the child is limited while the parent is incarcerated. However, Mother chose not to participate in any services when she was released from incarceration. After her release

---

[3]Pickrell was assigned to Mother's case around September 2021 or October 2021.

in November 2021, Mother's contact with 2INgage was inconsistent and sporadic. Pickrell testified that Mother maintained very little contact with her, despite her attempts to contact Mother at least nine times in November 2021 and at least seven times in December 2021. And when Mother would occasionally contact Pickrell, she asked only about visitations with E.B.

Mother's behavior also changed after she was released, and her interest in E.B. was inconsistent. On November 1, 2021, the trial court signed an Order for Mediation, which was scheduled to occur after Mother's release. Although she was no longer incarcerated on the date of the mediation and was required to attend, Mother did not attend the mediation. On November 17, 2021, Pickrell went to the address listed as Mother's residence to discuss Mother's service plan with her. Mother was late for the meeting. When Pickrell handed Mother a copy of the service plan, Mother handed it back and stated, "I don't want to be [E.B.'s] mother. I don't want my daughter; I don't need this." Confused, Pickrell asked Mother why she had changed her mind so quickly. Mother responded, "I can't be the mom she needs; I can barely keep myself alive. I have no home, no income, and I don't know how to be a mom. I love her, but . . . I'm a kid myself. I am not on my medication." Mother also told Pickrell that she had "superpowers" and "telekinesis" and that she could "move things with [her] mind." But moments later, Mother asked Pickrell for a visitation with E.B.; she did not follow up with Pickrell the next day regarding the visitation.

A few weeks later, Mother reached out to Pickrell to ask why she had not been able to visit E.B. yet. Pickrell agreed to set up a visitation with E.B. if Mother would first submit to a drug test. Mother agreed to the drug test, and Pickrell arranged for Mother to go to the drug-testing site. Mother no-called, no-showed for that appointment. Pickrell then attempted to set up another appointment for Mother on December 6, 2021, but Mother again did not show up for the appointment or otherwise respond to Pickrell's phone calls or text messages.[4] Pickrell testified that she did not have further contact with Mother after December 6, 2021.

Mother never attended any visitations with E.B. Prior to Mother's incarceration, a visitation via Zoom between Mother and E.B. had been scheduled.[5] Mother went to the 2INgage office for the visitation but refused to join the Zoom call because she believed she would be "trapped" in the call and sent to the past or the future. This was the only visitation ever scheduled with E.B. Moreover, Pickrell testified that after Mother's release, Mother asserted—approximately five to ten times—that she did not want to be E.B.'s mother and that she did not want to work her services. Pickrell confirmed that Mother had never started any services.

---

[4]Pickrell testified that Mother had asked about visitations with E.B. on several occasions, and each time Pickrell would agree to arrange a visitation if Mother would submit to a drug test. Pickrell even offered Mother transportation to the drug-testing location. However, Mother would not follow through with her appointments, and she never submitted to a drug test.

[5]E.B. had tested positive for Covid-19 and had to quarantine with her foster parents in their home.

## C. After Removal

At the time of trial, E.B. had been in the care of a foster-to-adopt family for almost her entire life. E.B.'s foster parents expressed that they wanted to adopt E.B. and that they were licensed to move forward with the adoption. Pickrell testified that E.B.'s placement with her foster family had been a "good environment" for E.B., who was very comfortable in her foster family's home and who had bonded with the family. She expressed that she did not have any concerns regarding E.B.'s emotional or physical well-being in her placement and that E.B. was an "extremely happy baby."

E.B.'s foster father testified that E.B. had been in his family's care since E.B. was just two weeks old and that Mother had never visited E.B. He and his wife, on the other hand, loved E.B. and were very interested in adopting her. E.B.'s guardian ad litem stated that she had observed E.B. in her foster home and that her foster parents were "very bonded" with and devoted to E.B. According to the guardian ad litem, E.B.'s foster parents had been giving E.B. everything that Mother and K.B. had been unable to provide to E.B. because of their drug use.

Pickrell testified that it would be in E.B.'s best interest to terminate Mother's parental rights and to allow E.B.'s foster parents the opportunity to adopt her. The guardian ad litem likewise recommended terminating Mother's parental rights so that E.B. could be adopted by her foster parents.

## II. Discussion

On appeal, Mother contends the evidence is legally and factually insufficient to support the trial court's findings that she constructively abandoned E.B., that she failed to comply with her service plan, and that termination of her parental rights is in E.B.'s best interest. *See id.* § 161.001(b)(1)(N), (O), (b)(2).

### A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination—here, TDFPS—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved,

and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that TDFPS proved the specific grounds for termination under Family Code Subsections 161.001(b)(1)(N) and (O) and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Statutory Termination Grounds

In her first two issues, Mother contends the evidence is legally and factually insufficient to support the trial court's finding that Mother committed either of the

alleged statutory grounds for termination of her parental rights. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N), (O).

The trial court was required to find only one statutory ground to terminate Mother's parental rights. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). For the reasons set out below, we conclude that the evidence is legally and factually sufficient to support the constructive-abandonment ground. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N).

### 1. Subsection 161.001(b)(1)(N)

Under Subsection (N), the trial court may terminate a parent's rights if it finds by clear and convincing evidence that the parent has

(N)     constructively abandoned the child who has been in the permanent or temporary managing conservatorship of [TDFPS] for not less than six months, and:

    (i)     [TDFPS] has made reasonable efforts to return the child to the parent;

    (ii)     the parent has not regularly visited or maintained significant contact with the child; and

    (iii)     the parent has demonstrated an inability to provide the child with a safe environment[.]

*Id.*

### 2. Analysis

Mother does not dispute that E.B. was in the temporary managing conservatorship of TDFPS for more than six months. Rather, she argues TDFPS

failed to prove (1) that it made reasonable efforts to return E.B. to Mother, either through its unlawful and defective service plan or after her release from incarceration; (2) that Mother failed to maintain significant contact with E.B. as far as she was permitted; and (3) that Mother demonstrated an inability to provide E.B. with a safe environment. *See id.*

Before we begin our analysis, we note that "[w]hen services are court ordered, the parent bears the burden of complying with them." *In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *14 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g); *see K.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-17-00184-CV, 2017 WL 3585255, at *2 (Tex. App.—Austin Aug. 17, 2017, no pet.) (mem. op.); *In re B.L.D.-O.*, No. 13-16-00641-CV, 2017 WL 929486, at *4 (Tex. App.—Corpus Christi–Edinburg Mar. 9, 2017, no pet.) (mem. op.); *In re P.N.M.*, No. 11-08-00080-CV, 2009 WL 714190, at *3 (Tex. App.—Eastland Mar. 19, 2009, no pet.) (mem. op.). If a parent is confused about the requirements of a service plan or believes the service plan is unfair, the parent may file a motion at any time to request the court to review the plan. *M.S.*, 2021 WL 2654143, at *14; *see* Tex. Fam. Code Ann. §§ 263.104(c), 263.405(c). Mother filed no such motion.

### a. Reasonable Efforts

Mother contends TDFPS cannot show that it implemented a lawful service plan or that Mother was given a reasonable opportunity to comply with her service plan. Mother also asserts that TDFPS's efforts after Mother's release from

incarceration are insufficient to prove "reasonable efforts" due to Mother's inability to comprehend the required services, TDFPS's refusal to allow Mother to visit E.B., TDFPS's failure to obtain records related to Mother's progress while incarcerated, and TDFPS's failure to outline lawful services while Mother was incarcerated.

When determining whether TDFPS made reasonable efforts, we focus on its efforts, not the parent's. *M.S.*, 2021 WL 2654143, at *13; *In re D.G.*, No. 02-17-00332-CV, 2018 WL 547787, at *4 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.). Preparing and administering a service plan for the parent, standing alone, constitutes evidence that TDFPS made reasonable efforts to return the child to the parent. *In re J.A.*, No. 01-21-00606-CV, 2022 WL 802982, at *4 (Tex. App.—Houston [1st Dist.] Mar. 17, 2022, no pet.) (mem. op.); *M.S.*, 2021 WL 2654143, at *14; *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.).

Because this element focuses on TDFPS's efforts, the fact that Mother was incarcerated is not dispositive. *See In re Z.F.S.*, No. 04-20-00489-CV, 2021 WL 603372, at *3 (Tex. App.—San Antonio Feb. 17, 2021, no pet.) (mem. op.) ("It is undisputed that [the parent] was incarcerated approximately three weeks after [TDFPS] explained the service plan to him. However, in reviewing whether [TDFPS] made a reasonable effort, we must focus on [TDFPS's] actions, not [the parent's]."). The trial court heard testimony that a plan of service was developed for Mother and that she received a copy; that Mother's previous case worker met with Mother to

review the service plan with her; that Mother's previous case worker maintained contact with Mother while she was incarcerated; that TDFPS requested an extension for Mother to fully engage in services; that Mother was given an extension because she was incarcerated; that Pickrell met with Mother after her release to review her service plan with her; that mediation was scheduled, which Mother was informed of but did not attend; that Pickrell agreed to set up Mother's visitations with E.B. if Mother would take a drug test; that Pickrell set up multiple drug-testing appointments for Mother even after Mother no-called, no-showed; that Pickrell offered to drive Mother to the drug-testing site; that Pickrell attempted to contact Mother several times in November 2021 and December 2021; that Pickrell physically went to the address provided by Mother's attorney to try to find Mother; and that Pickrell never gave up trying to help Mother complete her services.

TDFPS's efforts must be reasonable, not ideal. *M.S.*, 2021 WL 2654143, at *13 (citing *In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco 2010, no pet.)). We hold that the evidence is legally and factually sufficient to support the trial court's finding that TDFPS made reasonable efforts to return E.B. to Mother. *See In re J.S.*, No. 02-19-00231-CV, 2019 WL 5655254, at *5 (Tex. App.—Fort Worth Oct. 31, 2019, pet. denied) (mem. op.) (upholding trial court's finding of TDFPS's reasonable efforts where TDFPS created a service plan for the parent and attempted to locate her but could not); *C.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-18-00852-CV, 2019 WL 3367524, at *7 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.) ("The

15

caseworker persisted in trying to set up appointments and assist [father] with work on his parenting service plan, and a lack of communication was not [TDFPS's] fault."); *In re G.T.*, No. 02-17-00279-CV, 2017 WL 6759036, at \*4 (Tex. App.—Fort Worth Dec. 28, 2017, no pet.) (mem. op.) ("A reasonable factfinder could form a firm conviction or belief that [the minor parent's] running away [shortly after receiving the service plan] did constitute an unwillingness to complete the service plan as well as a rejection of the services offered in the plan."); *Gamez v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-09-00190-CV, 2009 WL 4456150, at \*7 (Tex. App.—Austin Dec. 1, 2009, no pet.) (mem. op.) (concluding in dicta that TDFPS's attempts to locate the parent and to provide services to her while the case was pending supported the "reasonable efforts" element of constructive abandonment).

### b. Regular Visits or Significant Contact

Mother asserts that the trial court prohibited visits with E.B. while Mother was incarcerated and argues that, after she was released, TDFPS prevented her from seeing E.B. by unilaterally requiring that Mother submit to a drug test before visiting with E.B. Thus, Mother asserts, TDFPS cannot prove that Mother failed to maintain significant contact with E.B.

It is undisputed that Mother had not seen or visited E.B. since she was two weeks old. While the trial court may have prohibited visitations while Mother was incarcerated, Mother's own actions—both before and after incarceration—prevented her from visiting E.B. Before she was incarcerated, Mother refused to attend the

16

scheduled Zoom visitation with E.B. at the 2INgage office. After she was released, Mother did request visits with E.B., which Pickrell told Mother she would arrange if Mother would first submit to a drug test.[6] And Pickrell set up multiple drug-testing appointments for Mother; she even offered to drive Mother to the drug-testing site, but Mother repeatedly no-called, no-showed. Despite Pickrell's efforts, Mother failed to submit to a drug test, even though doing so meant she could visit E.B. Additionally, Mother asserted—approximately five to ten times—that she did not want to be E.B.'s mother, that she could not take care of E.B., and that she did not want to work her services.

We hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother had not regularly visited or maintained significant contact with E.B. *See M.S.*, 2021 WL 2654143, at \*15 (upholding trial court's finding that the parent failed to visit or maintain significant contact with the child when evidence showed that the parent's contact was "sporadic and chaotic"); *J.S.*, 2019 WL 5655254,

---

[6]Mother asserts TDFPS's drug-testing prerequisite was not part of the trial court's order and was therefore not a condition of visitation. However, the service plan required that Mother "submit to random drug screens on the day requested." In other words, Mother was required to submit to drug testing when requested by TDFPS. The reason she did not visit E.B. was not TDFPS's fault but rather her own failure (and apparent unwillingness) to comply with her service plan. *See In re I.D.*, No. 05-21-00244-CV, 2021 WL 4236878, at \*5 (Tex. App.—Dallas Sept. 17, 2021, pet. denied) ("[W]e conclude that [TDFPS] did not unreasonably thwart Father's possession and access, because submitting to drug testing to regain access to the children was within his control" and also holding that Subsection (N)(ii) has no voluntariness component, i.e., under that section's plain language, it does not matter *why* the parent did not regularly visit or maintain contact with the child).

at \*6 (upholding constructive-abandonment finding when the evidence showed that the mother had not been a consistent figure in the children's lives, that she chose not to attend a meeting with her case worker concerning visitation, and that she expressed an intent to voluntarily give up her parental rights to the children); *In re T.T.*, No. 11-18-00291-CV, 2019 WL 1716416, at \*2–3 (Tex. App.—Eastland Apr. 18, 2019, no pet.) (mem. op.) (upholding constructive-abandonment finding when evidence showed that the father had not seen his child for years and that he did not try to contact the child while the case was pending, despite being informed how he might do so); *In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied) (holding the trial court could have reasonably found that the parent failed to regularly visit or maintain significant contact with the child when the parent did not accept TDFPS's offer to accommodate visitations around the parent's schedule).

### c. Safe Environment

Mother asserts—vaguely and without supporting authority—that because Pickrell did not see inside Mother's home and therefore did not have an opinion as to whether the home was safe for E.B., and because TDFPS implemented an unlawful service plan, TDFPS cannot prove that Mother presented an inability to provide E.B. with a safe environment.

Evidence a factfinder may consider in determining whether a parent has shown that she cannot provide her child with a safe environment includes the parent's failure to participate in services and to visit the child, the parent's lack of stable housing or

18

stable employment, the parent's past substance abuse, and the actions that led to the initial removal. *J.S.*, 2019 WL 5655254, at *6; *C.G.*, 2019 WL 3367524, at *7; *A.K. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-14-00450-CV, 2014 WL 6612609, at *4 (Tex. App.—Austin Nov. 21, 2014, no pet.) (mem. op.); *In re M.R., J.*, No. 07-13-00440-CV, 2014 WL 2591616, at *5 (Tex. App.—Amarillo May 9, 2014, no pet.) (mem. op.).

Pickrell testified that Mother failed to participate in her services. Both Pickrell and E.B.'s foster father testified that Mother never visited E.B. and had not seen her since she was two weeks old. Pickrell also testified that Mother had not shown an ability to keep stable housing or stable employment and had not begun to work her services. Despite several attempts, Pickrell was unable to see the inside of Mother's home. Additionally, the trial court heard evidence that Mother was incarcerated for most of her case, that she had issues with past substance abuse, and that she had admitted to using illegal drugs since her release. Mother told Pickrell on several occasions that she did not want to be E.B.'s mother and that she could not take care of E.B. Finally, E.B.'s father is deceased, and Pickrell testified that there are no living relatives that would be a suitable placement for E.B.

We hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother demonstrated she could not provide E.B. with a safe, stable environment. *See J.S.*, 2019 WL 5655254, at *6 (upholding constructive-abandonment finding when the parent failed to stay in contact with the case worker,

19

failed to begin services, failed to show an ability to keep stable housing or stable employment, and had a history of incarceration related to her drug use); *In re G.P.*, 503 S.W.3d 531, 535 (Tex. App.—Waco 2016, pet. denied) ("By not providing [TDFPS] with any information about her living or employment circumstances, . . . refusing to take required drug tests, and failing to even maintain contact with [the child], the trial court could have reasonably concluded that [the parent] failed to provide [the child] with a safe environment."); *In re T.M.*, No. 02-09-00145-CV, 2009 WL 5184018, at *5 (Tex. App.—Fort Worth Dec. 31, 2009, pet. denied) (mem. op.) ("[T]he evidence establishes Father's inability to provide the children with *any* environment . . . much less a *safe* environment . . . .").

### 3. Conclusion

We hold that the evidence is legally and factually sufficient to support the trial court's finding that Mother constructively abandoned E.B. Accordingly, we overrule Mother's issue regarding termination under Subsection (N). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N). Because a finding of only one of the grounds alleged under Section 161.001(b)(1) is sufficient to support termination, *A.V.*, 113 S.W.3d at 362, we need not reach Mother's issue regarding termination under Subsection (O). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

## C. Best Interest

In Mother's final issue, she challenges the sufficiency of the evidence supporting the trial court's determination that termination of Mother's parental rights

is in E.B.'s best interest. For the reasons set out below, we overrule Mother's issue related to the trial court's best-interest finding.

### 1. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)   the [child's] desires . . . ;

(B)   the [child's] emotional and physical needs[,] . . . now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)   the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

21

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**2. Analysis**

Mother challenges certain of the best-interest factors. She broadly asserts that TDFPS failed to prove that termination of her parental rights is in E.B.'s best interest because only conclusory statements were offered as proof and because, in part, TDFPS implemented an "unlawful" service plan for Mother. We disagree.

**a. E.B.'s Emotional and Physical Needs**

E.B. was removed from Mother's care when she was only two weeks old and had been with her foster parents for most of her life. Pickrell testified that E.B.'s placement with her foster parents had been a "good environment" for E.B. and that

22

E.B. and her foster parents had bonded. When E.B went to live with her foster parents, she had experienced developmental issues with her gross motor skills. E.B. was put in physical therapy and had improved significantly while in the care of her foster parents. And E.B.'s foster parents expressed that they loved E.B., that they wanted to adopt her, and that they were licensed to adopt.

In contrast, Mother had not seen E.B. since she was two weeks old. Although Mother occasionally requested visitations with E.B., Mother would not submit to the drug testing requested by TDFPS in order for her to do so. Moreover, Mother voiced several times that she did not want to be E.B.'s mother and that she could not take care of E.B. The trial court was entitled to view this factor as supporting a best-interest finding.

### b. Emotional and Physical Danger to E.B. Now and in the Future

On appeal, Mother criticizes TDFPS's concerns—based, in part, on Mother's statements[7]—that she may have had a mental illness. She argues that TDFPS failed to establish that Mother's statements or potential mental instability were dangerous to E.B. But even without considering these statements or potential mental instability, there is other evidence in the record that supports this factor. Mother explicitly told Pickrell—several times throughout the case—that she did not want to be E.B.'s

---

[7]Mother stated that she could barely keep herself alive and that she was "not on [her] medication." She also told Pickrell that she had "superpowers" and "telekinesis" and that she could "move things with [her] mind." And Mother refused to attend visits with E.B. or court proceedings via Zoom because she believed she would get "trapped" in Zoom.

mother and that she could not take care of E.B. Additionally, a home with Mother would likely include drugs and, potentially, violence. As noted above, Mother's criminal history consists of several charges and convictions for assault- and drug-related offenses. Mother was incarcerated for most of the case because she had violated her probation when she was arrested for possession of marijuana. Further, Mother admitted that she had used illegal drugs since being released from incarceration in November 2021.

The trial court was entitled to infer from Mother's past conduct that she might commit similar acts in the future. *See In re C.B.*, No. 02-22-00212-CV, 2022 WL 15076123, at *3 (Tex. App.—Fort Worth Oct. 27, 2022, no pet. h.) (mem. op.) (inferring from the parent's past conduct that she may commit similar acts in the future); *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 715 (Tex. App.—El Paso 2012, no pet.) ("The record supports an inference that [the parent's] course of misconduct before and throughout this case would continue into the future."); *see also In re A.J.M.*, No. 04-17-00681-CV, 2018 WL 1511824, at *6 (Tex. App.—San Antonio Mar. 28, 2018, pet. denied) (mem. op.) (holding that father's "criminal conduct is clearly evidence of his unwillingness to protect [the child] and to put [the child's] needs above his own destructive life choices"). This factor supports the trial court's finding that termination of Mother's parental rights is in E.B.'s best interest.

### c. Stability

Children need long-term safety, stability, and permanency; providing for a child's physical and emotional needs is of paramount importance. *C.B.*, 2022 WL 15076123, at *3; *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied); *see also* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."). In her appellate brief, Mother ostensibly admits that her incarceration impeded her ability to demonstrate stability. She asserts that she could have demonstrated a higher level of stability if TDFPS had "actually implemented a lawful service plan." However, Mother was incarcerated because of her own actions. It is difficult to excuse Mother for her lack of stability based on her incarceration when that incarceration was the consequence of her own choices. *See C.B.*, 2022 WL 15076123, at *4; *J.O.A.*, 283 S.W.3d at 346 (considering parent's history of irresponsible choices in best-interest determination).

Additionally, Mother's past conduct does not bode well for her ability to provide a stable home for E.B., and nothing in the record indicates that Mother will have a future ability to provide a stable home. *See C.B.*, 2022 WL 15076123, at *3; *In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc op. on reh'g) (opining that a parent's frequent incarceration leaves a child without a stable environment). Indeed, Pickrell testified that she was unable to determine whether Mother had a permanent address or was homeless, whether

Mother was employed or had any income, or whether Mother was able to provide a safe and stable environment for E.B.

In contrast, E.B.'s foster parents had provided a "good environment" for E.B., who was described as an "extremely happy baby" while in their care. E.B.'s guardian ad litem opined that E.B.'s foster parents had been giving her everything that her biological parents could not because of their drug use. Finally, E.B.'s foster parents indicated that they loved her, that they wanted to adopt her, and that they were licensed to adopt. The trial court could have found that Mother's inability to provide stability for E.B. supported a finding that termination of Mother's rights is in E.B.'s best interest.

### d. Acts or Omissions Indicating Whether the Parent–Child Relationship is a Proper One, and Any Excuses for Those Acts or Omissions

Mother's criminal history, incarceration, and complete lack of interaction with E.B. supports the trial court's finding that reunification with Mother would not be in E.B.'s best interest. *See C.B.*, 2022 WL 15076123, at *3; *In re J.M.G.*, 608 S.W.3d 51, 57 (Tex. App.—San Antonio 2020, pet. denied) (asserting that absence during early years of child's life due to incarceration threatens the child's emotional well-being and indicates that the parent's relationship with the child is not a proper one). While Mother acknowledges responsibility for her incarceration, it is difficult to excuse Mother for her failings based on her incarceration when that incarceration was because of her own choices. *See C.B.*, 2022 WL 15076123, at *4; *J.O.A.*, 283 S.W.3d at

346 (considering parent's history of irresponsible choices in best-interest determination).

Additionally, Mother's failure to visit with E.B. or participate in services when she was not incarcerated is probative of the fact that her relationship with E.B. is not a proper one. *See C.B.*, 2022 WL 15076123, at *3 (stating the parent's failure to exercise visitation rights prior to incarceration and her failure to pay child support is probative); *Dowell v. Dowell*, 276 S.W.3d 17, 22 (Tex. App.—El Paso 2008, no pet.) (holding a parent's failure to exercise visitation rights is relevant to the best-interest issue). Mother's excuses, presumably, for failing to comply with her service plan are based on her incarceration and TDFPS's alleged failure to implement a lawful service plan for Mother. But Mother fails to explain why she did not begin or even attempt to participate in services after she was released. Mother had not seen E.B. since she was two weeks old, but Mother does not explain why she would not submit to a drug test if it meant seeing her child again. Notably, Mother does not clarify why she had previously told Pickrell that she did not want to be E.B.'s mother and that she could not take care of E.B. She provides no excuse for why she did not maintain sufficient contact with TDFPS after her release, despite Pickrell's continued attempts to reach her. And Mother does not explain why she chose not to participate in the case after her release, why she did not appear for mediation, or why she did not appear for trial.

## III. Conclusion

Having overruled Mother's issue regarding termination under Subsection 161.001(b)(1)(N) and Mother's challenge to the trial court's best-interest finding, we affirm the trial court's order terminating Mother's parental rights to E.B.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: November 23, 2022